Case No. 20-2286

---

United States Court of Appeals for the Sixth Circuit

## GERALD BYRD
*Plaintiff-Appellant*,

v.

## RANDALL HAAS, Warden; DAVID M. LEACH, Special Activities Coordinator; KENNETH MCKEE, Deputy Director; [UNKNOWN] UMEH
*Defendants-Appellees.*

On Appeal from the United States District Court
for the Eastern District of Michigan

---

## APPELLANT'S BRIEF

---

Jeffrey A. Crapko (P78487)
Amanda Rauh-Bieri (P83615)
150 West Jefferson Street, Ste. 2500
Detroit, Michigan 48226
(248) 267-3296
crapko@millercanfield.com
rauh-bieri@millercanfield.com
Pro Bono Counsel for Petitioner-Appellant

# TABLE OF CONTENTS

**Page**

STATEMENT REGARDING ORAL ARGUMENT ............................................vi

JURISDICTIONAL STATEMENT ...................................................... vii

ISSUES PRESENTED............................................................ vii

INTRODUCTION ..................................................................1

STATEMENT OF THE CASE...........................................................3

    A.    Gerald Byrd is a Devout Practitioner of Ifa .........................................3

    B.    MDOC Policy Allows Prisoners to Request Personal Religious
        Items that are Not Listed in the Policy Directive.................................6

    C.    Byrd Followed the Directions Provided in the Policy ........................9

        1.    Byrd Sends His Initial Religious Request................................9

        2.    Byrd Sent a Second Request to the Macomb Warden for
            the Same Religious Items and Services ...................................10

    D.    Defendants Failed to Follow MDOC Policy by Continuously
        Refusing to Consider Byrd's Religious Requests .............................12

    E.    Procedural History...............................................................16

SUMMARY OF ARGUMENT ............................................................17

STANDARD OF REVIEW .............................................................19

ARGUMENT .......................................................................20

    I.  Byrd's claims against Defendants Haas and Leach are not moot............20

    II.  Byrd's RLUIPA claims against Defendants Haas, Leach, and
        McKee should proceed to trial. ...........................................22

    A.    Byrd's religious beliefs are sincerely held. .......................................23

    B.    Defendants substantially burdened Byrd's rights. ............................24

        1.    Denial of Group Services for Ifa..........................................25

        2.    Denial of Necessary Religious Personal Items.......................26

        3.    Each Defendant has burdened Byrd's RLUIPA rights...........29

    C.    The Defendants cannot satisfy the "daunting" compelling-
        interest and least-restrictive-means test. ...........................................31

# TABLE OF CONTENTS
(continued)

III.  Byrd's Free Exercise Claims against Defendants Haas, Leach, and McKee Should Proceed. ............................................................36

A.    Summary judgment on Byrd's free exercise claims was erroneous ..........................................................................37

    1.    Defendants fail the first Turner factor. .....................................39

    2.    Defendants cannot meet the remaining three Turner factors...........................................................................40

B.    Defendants are not entitled to qualified immunity.............................42

IV.  Byrd's Fourteenth Amendment Equal Protection claims should proceed. ........................................................................45

A.    Defendants violated Byrd's Equal Protection rights.........................45

B.    Defendants are not entitled to qualified immunity.............................48

V.  Byrd's Fourteenth Amendment Procedural Due Process claims against Defendant Haas should proceed. .............................................49

A.    Defendant Haas denied Byrd Fourteenth Amendment Due Process...........................................................................50

B.    Defendant Haas is not entitled to qualified immunity. .....................52

CONCLUSION AND RELIEF REQUESTED ......................................................53

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Al Humrani v. Kleeman*,
   No. 2:05-cv-203, 2006 WL 2528461 (W.D. Mich. Aug. 31, 2006)...................49

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986)......................................................................................20

*Bakr v. Johnson*,
   121 F.3d 707 (6th Cir. 1997) ..........................................................................50

*Brown v. Johnson*,
   743 F.2d 408 (6th Cir. 1984) ..........................................................................44

*Cavin v. Mich. Dep't of Corrections*,
   927 F.3d 455 (6th Cir. 2019) ............................................ 18, 22, 23, 26, 31, 44

*Cruz v. Beto*,
   405 U.S. 319 (1972)...................................................................................47, 49

*Daugherty v. Campbell*,
   935 F.2d 780 (6th Cir. 1991) ..........................................................................19

*Figel v. Overton*,
   121 F. App'x 642 (6th Cir. 2005) ....................................................................38

*Flagner v. Wilkinson*,
   241 F.3d 475 (6th Cir. 2001) ....................................................37, 38, 39, 40, 41

*Fox v. Washington*,
   949 F.3d 270 (6th Cir. 2020) ............................................ 22, 23, 26, 27, 28, 36

*Harbin-Bey v. Rutter*,
   420 F.3d 571 (6th Cir. 2005) ..........................................................................46

*Holt v. Hobbs*,
   574 U.S. 352 (2015).............................................................................22, 29, 31

*Hope v. Pelzer*,
 536 U.S. 730 (2002) .......................................................................................43

*Horacek v. Heyns*,
 No. 2:13-CV-280, 2016 WL 11263235 (W.D. Mich. Dec. 15,
 2016) ...........................................................................................................21

*Karcher v. May*,
 484 U.S. 72 (1987) .......................................................................................20

*Kisela v. Hughes*,
 138 S. Ct. 1148 (2018) .................................................................................42

*Koger v. Mohr*,
 964 F.3d 532 (6th Cir. 2020) .......................................................19, 45, 46, 48

*Koger v. Mohr*,
 969 F.3d 532 (6th Cir. 2020) ........................................... vii, 46, 47, 48

*Ky. Dep't of Corr. v. Thompson*,
 490 U.S. 454 (1989) ................................................................................50, 51

*Maye v. Klee*,
 915 F.3d 1076 (6th Cir. 2019) ..................................................37, 43, 44, 45, 47

*McDaniel v. Precythe*,
 897 F.3d 946 (8th Cir. 2018) ...................................................................20, 21

*Moran v. Al Basit LLC*,
 788 F.3d 201 (6th Cir. 2015) .......................................................................19

*Morgan v. Fairfield Cnty, Ohio*,
 903 F.3d 553 (6th Cir. 2018) ...................................................................42, 43

*Mumford v. Basinski*,
 105 F.3d 264 (6th Cir. 1997) ...................................................................20, 21

*Munir v. Scott*,
 12 F.3d 213 (6th Cir. 1993) .........................................................................44

*New Doe Child # 1 v. Congress of United States*,
 891 F.3d 578 (6th Cir. 2018) ..........................................................24, 25, 28, 29

*Sandin v. Conner*,
   515 U.S. 472 (1995)............................................................................ vii, 19, 50

*Scarbrough v. Morgan Cty Bd. of Educ.*,
   470 F.3d 250 (6th Cir. 2006) ..............................................................46

*Stoudemire v. Michigan Dep't of Corr.*,
   705 F.3d 560 (6th Cir. 2013) ..............................................................43, 44, 52

*Turner v. Safley*,
   482 U.S. 78 (1987)................................................... vii, 18, 36, 37, 38, 39, 40, 41

## Statutes

28 U.S.C. § 1291 ...................................................................................... viii

42 U.S.C. § 2000cc *et seq.*...................................................................16, 23

Religious Land Use and Institutionalized Persons Act.... vii, 1, 2, 16, 17, 18, 20, 22,
   23, 25, 26, 29, 30, 31, 32, 33, 34, 35, 36

## Court Rules

Federal Rule of Civil Procedure 56(a).......................................................19

Federal Rule of Civil Procedure 25 ...................................................... vii, 17, 20, 21

## Other Authorities

First Amendment............................................. vii, 1, 2, 16, 18, 19, 22, 36, 44, 50, 52

Fourteenth Amendment ................................. vii, 1, 2, 3, 5, 16, 17, 18, 19, 45, 49, 50

## STATEMENT REGARDING ORAL ARGUMENT

This is a complex § 1983 case involving multiple claims against multiple defendants and the tenets of an unfamiliar religion. The district court record in this case is long and detailed, spanning hundreds of pages and several years of proceedings. Plaintiff/Appellant Gerald Byrd respectfully requests oral argument to aid this Court's decision process.

# JURISDICTIONAL STATEMENT

Plaintiff/Appellant appeals from the district court's November 23, 2020 order, dismissing all of Plaintiff/Appellant's claims with prejudice (Judgment, RE 115), so this Court has jurisdiction under 28 U.S.C. § 1291.

# ISSUES PRESENTED

1. Whether the district court erred when it ignored Federal Rule of Civil Procedure 25(d) and held that Plaintiff's claims against retired defendant prison officials in their official capacities were moot when the constitutional violations against Byrd remain ongoing?

2. Whether the district court erred in granting summary judgment on Byrd's claims under the Religious Land Use and Institutionalized Persons Act where Byrd demonstrated his sincere religious beliefs, the substantial burden posed to the practice of his religion by Defendants' actions, and Defendants did not even attempt to meet strict scrutiny?

3. Whether the district court erred in granting summary judgment on Byrd's First Amendment Free Exercise claims when it erroneously disregarded *Turner v. Safley*, 482 U.S. 78 (1987)?

4. Whether the district court erred in granting summary judgment on Byrd's Fourteenth Amendment Equal Protection claims when it disregarded *Koger v. Mohr*, 969 F.3d 532 (6th Cir. 2020)?

5. Whether the Byrd's Fourteenth Amendment Due Process claim against Defendant Haas should proceed when that claim is not moot, and where there is a fact dispute as to whether Defendant Haas imposed an "atypical and significant hardship" on Byrd's right to practice his religion under *Sandin v. Conner*, 515 U.S. 472 (1995)?

## INTRODUCTION

After nearly five years, Gerald Byrd is still waiting for the Michigan Department of Corrections to respond to his requests for group religious services and basic religious items he requires. For all of these five years, Defendant MDOC officials have let Byrd's straightforward requests languish for no good reason—violating Byrd's rights under the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), the First Amendment Free Exercise Clause, and the Fourteenth Amendment Equal Protection and Due Process Clauses.

Since 2015, Byrd has been a devout practitioner of Ifa, a West African religion. To practice their religion, adherents of Ifa require the ability to worship in a group and access to religion items including, among other things, herbs for smudging and herbal baths, a straw mat, and religious beads. MDOC policy recognizes Ifa (which it improperly refers to as "Yoruba"), but does not permit any of these items or allow group services. So, beginning in 2015, Byrd submitted multiple formal requests in line with MDOC policy asking Defendants to approve group services and the necessary religious items so that he could practice Ifa. Defendants have ignored those requests.

Instead, in response to Byrd's lawsuit, Defendant MDOC officials have offered a slew of silly excuses for their inability to consider Byrd's routine requests for basic religious accommodations. Despite the fact that Byrd has repeatedly

1

complied with the plain requirements of MDOC's policy, Defendants faulted Byrd for his failure to use the right letterhead, his failure to handwrite his requests, and for the fact that he copied additional recipients on his requests. Further, in the face of record evidence that unequivocally shows that Defendants' refusal to consider Byrd's requests had *nothing* to do with security considerations, Defendants offered impermissible post-hoc "security" rationales. In short, Defendants have burdened Byrd's religious rights, and they can offer no good, contemporaneous reason for why they did so. *All* religions are entitled to the same protections—even those religions that may seem obscure or unfamiliar to Defendants.

Defendants' years-long refusal to consider Byrd's requests burdens his rights under RLUIPA, the First Amendment, the Fourteenth Amendment Due Process Clause, and the Fourteenth Amendment Due Process Clause. At a minimum, genuine fact issues remain as to whether Defendants violated Byrd's rights. Summary judgment was therefore inappropriate, and Byrd asks this Court to reverse the district court's judgment.

## STATEMENT OF THE CASE

**A.    Gerald Byrd is a Devout Practitioner of Ifa.**

Since August 3, 2015, Byrd has exclusively practiced the Ifa[1] religion. (*See* Response to Motion for Summary Judgment Ex. A, RE 87-2, PageID# 1281; Response to Motion for Summary Judgment Ex. C, RE 87-4, PageID# 1344-57, 1370-71.)  Ifa originated in Western Africa, particularly among the Yoruba people of Southwest Nigeria. (*See* Response to Motion for Summary Judgment Ex. D, RE 87-5, PageID# 1478-79.) Ifa has traditionally been handed down orally from one generation to the next. (*See id.*; *see also* Response to Motion for Summary Judgment Ex. C, RE 87-4, PageID# 1372; *see also* Response to Motion for Summary Judgment Ex. E, RE 87-6, PageID# 1616.)  As such, Ifa does not have an authoritative holy book such as the Bible or the Quran. (*See id.*).

Ifa practitioners "believe in a supreme being called Olodumare." (*See* Response to Motion for Summary Judgment Ex. D, RE 87-5, PageID# 1478-79; Response to Motion for Summary Judgment Ex. C, RE 87-4, PageID# 1356; Response to Motion for Summary Judgment, RE 87-6 Ex. E, PageID# 1577-78.)

---

[1] Current MDOC policy refers to the Ifa religion as the Yoruban religion. (*See* Response to Motion for Summary Judgment Ex. B, RE 87-3, PageID# 1322.) This is incorrect—the Yoruban people are a people indigenous to Western Africa, of which, many practice Ifa. But Ifa is not coextensive with Yoruban culture. All references in this motion which refer to Ifa should therefore be understood to include MDOC's reference to the Yoruban religion. (*See also* Order, RE 63, PageID# 620 n.2).

There are various deities and forces of nature beneath Olodumare called Orisha, who act as spiritual functionaries. (*See* Response to Motion for Summary Judgment Ex. D, RE 87-5, PageID# 1478-79; *see also* Response to Motion for Summary Judgment Ex. C, RE 87-4, PageID# 1378; Response to Motion for Summary Judgment Ex. E, RE 87-6, PageID# 1618.) Divination is an essential form of communication between the practitioner and their ancestors and the Orisha. (Response to Motion for Summary Judgment Ex. E, RE 87-6, PageID# 1618). Through divination, the practitioner gains necessary guidance and wisdom on life decisions. (*See* Response to Motion for Summary Judgment Ex. D, RE 87-5, PageID# 1478-79; Response to Motion for Summary Judgment Ex. C,  RE 87-4, PageID# 1408-09; Response to Motion for Summary Judgment Ex. E, RE 87-6, PageID# 1594.) Thus, many of Ifa's most fundamental religious practices center around divination. (*See* Response to Motion for Summary Judgment Ex. C, RE 87-4, PageID# 1378-79; Response to Motion for Summary Judgment Ex. E, RE 87-6, PageID# 1616-18.)

Individual practitioners must divine in order to practice Ifa and commune with their ancestors and the Orisha. In order to conduct divination, Ifa practitioners must cast either kola nuts or cowrie shells affixed to coconut shells onto a divination tray called an "Opon Ifa." (Response to Motion for Summary Judgment Ex. E, RE 87-6, PageID# 1625-26; Response to Motion for Summary Judgment Ex. D, RE 87-4, PageID# 1408-10.) Divination must be conducted with a mat or cloth protecting the

divination from the ground. (Response to Motion for Summary Judgment, Ex. E, RE 87-6, PageID# 1628-30.) The practitioners read the combination of results from the cast to divine answers from the Orisha. (*Id.*). Similarly, practitioners use herbal baths (using a variety of herbs) in order to properly invoke particular Orisha. (*Id.*) Ifa practitioners also believe that a small wooden or stone "Elegba head" is a representation of the divine messenger, Esu, who is necessary to facilitate communication with the Orisha. (Response to Motion for Summary Judgment Ex. C, RE 87-4, PageID# 1408.) Ifa practitioners also require a set of necklace and bracelet beads called Ileke and Ide beads, which offer spiritual protection and facilitate communication with the Orisha during divination. (Response to Motion for Summary Judgment Ex. E, RE 87-6, PageID# 1630-53; Response to Motion for Summary Judgment Ex. D, RE 87-5, PageID# 1481-82.) Finally, the Ifa religion is a communal one and group worship is required. (Response to Motion for Summary Judgment Ex. D, RE 87-5, PageID# 1481-82.). During group worship, practitioners light candles and burn sage to invoke the various Orisha. (Response to Motion for Summary Judgment Ex. E, RE 87-6, PageID# 1635-38; *see also* Response to Motion for Summary Judgment Ex. K, RE 87-12, PageID# 2148-52.)

MDOC formally recognized Ifa in 2005. (*See* Response to Motion for Summary Judgment Ex. F, RE 87-7, PageID# 1692.) However, MDOC does not allow group services for the Ifa religion, *see id.*; *see also* Response to Motion for

Summary Judgment Ex. B, RE 87-3, PageID# 1322, ("the Policy"), even though they are religiously required. And MDOC does not allow Ifa practitioners to possess kola nuts (or cowrie shells affixed to coconut shells), a divination tray, a straw mat or cloth for divination, an Elegba head, Ileke and Ide religious beads, access to various herbs required for herbal baths and smudging, or access to candles for group services, all of which are necessary for worship and divination in the Ifa religion. (*See id.*)

## B.    MDOC Policy Allows Prisoners to Request Personal Religious Items that are Not Listed in the Policy Directive.

As he was supposed to do, Byrd turned to the MDOC Policy Directive governing religious beliefs and practices of prisoners to request group services and necessary personal religious items for Ifa. (Response to Motion for Summary Judgment Ex. B, RE 87-3, PageID# 1319-22.)

According to the Policy[2] "all prisoners may possess personal religious property that has not already been authorized … with approval of the Deputy Director." (Response to Motion for Summary Judgment Ex. B, RE 87-3, PageID#

---

[2] Although the Policy has been revised many times in the last decade, the sections pertinent to this lawsuit have not changed (*See* Response to Motion for Summary Judgment Ex. B, RE 87-3, PageID# 1283-1327 and Response to Motion for Summary Judgment Ex. G, RE 87-8, PageID# 1694-1704 at ¶¶ HH-MM and ¶¶ I-L).

1288 at ¶ JJ.)[3] The Policy provides instructions for prisoners to follow in order to receive a determination from the Deputy Director (Defendant McKee) regarding requested personal religious items. (*Id.*). A prisoner must submit his request "in writing to the Warden *or* [the Warden's] designee and include a description of the religious item along with an explanation of its significance to the prisoner's designated religion." (*Id.*). Once the prisoner has submitted his request to the Warden, it is out of the prisoner's hands, and he can only wait for his request to make its way to the Deputy Director. (*Id.*).

The Warden (here, Defendant Haas) or his designee *must* "forward the request and any supporting documents to the CFA Special Activities Coordinator through the appropriate chain of command."[4] Notably, the Policy does not identify who the Warden's designee is. (*Id.*). Further, there is no directive for prisoners to refer to in order to identify the Warden's designee. (Response to Motion for Summary Judgment Ex. H, RE 87-9, PageID# 1758-59; Response to Motion for Summary Judgment Ex. I, RE 87-10, PageID# 1870-71.) The Warden or his designee does not have discretion regarding whether to pass the religious request to the Special

---

[3] The process for religious group services approval mirrors the steps required for religious personal items approval. (*See* Response to Motion for Summary Judgment Ex. B, RE 87-3, PageID# 1284 at ¶ I-L.)

[4] The policy does not define the "appropriate chain of command."

Activities Coordinator (Defendant Leach). (*See* Response to Motion for Summary Judgment Ex. B, RE 87-3, PageID# 1284, 1288 at ¶¶ K, JJ).

Once the Warden has forwarded the request to the Special Activities Coordinator, "[t]he CFA Special Activities Coordinator shall present the material to the [Chaplaincy Advisory Committee (CAC)] for review." (*Id.*). The CAC is a group of religious leaders from the outside community who provide advice on religious topics as requested by MDOC, researching discrete religions as necessary. (*See* Response to Motion for Summary Judgment Ex. J, RE 87-11, PageID# 1982-83, 1993.) The Special Activities Coordinator then submits the religious items or services request, along with the CAC recommendation, to the Deputy Director for review. (RE 8 Response to Motion for Summary Judgment Ex. B, 7-3, PageID# 1284, 1288 at ¶¶ K, JJ)

Finally, it's the Deputy Director's duty to determine whether to grant the prisoner's religious items request. (*Id.*) The Deputy Director considers: (1) "whether [the religious item] is necessary to the practice of the prisoner's religion;" and (2) "whether possession of the item would pose a threat to the custody and security of the facility." (*Id.*). Current Deputy Director Defendant McKee testified that he has never conducted such an analysis, and is unaware of what he would need to do to consider whether an item constitutes a custody or security threat. (Response to Motion for Summary Judgment Ex. Q, RE 87-18, PageID# 2218-19.) Once a

determination is made, the Warden must inform the prisoner of the Deputy Director's decision. (Response to Motion for Summary Judgment Ex. B, RE 87-3, PageID# 1288 at ¶ KK.)

## C.    Byrd Followed the Directions Provided in the Policy.

### 1.    *Byrd Sends His Initial Religious Request.*

On September 2, 2015, Byrd sent his first request for necessary religious items and group religious services for the Ifa religion. (*See* Response to Motion for Summary Judgment Ex. K, RE 87-12, PageID# 2148-52; Response to Motion for Summary Judgment Ex. C, RE 87-4, PageID# 1382-83.) Byrd's letter was addressed to Special Activities Coordinator Leach. (Response to Motion for Summary Judgment Ex. K, RE 87-12, PageID# 2148.) At the time he sent the letter, Byrd was housed at the Saginaw Correctional Facility (SRF), so he sent his letter to the SRF Warden too. (Response to Motion for Summary Judgment Ex. C, RE 87-4, PageID# 1388.). It is undisputed that Byrd's letter satisfied the only requirements listed in the Policy: "a description of [each] religious item along with an explanation of its significance to the prisoner's designated religion." (Response to Motion for Summary Judgment Ex. B, RE 87-3, PageID# 1283-1327; Response to Motion for Summary Judgment Ex. K, RE 87-12, PageID# 2148-52; RE 80 PageID# 726).

2.    *Byrd Sent a Second Request to the Macomb Warden for the Same Religious Items and Services.*

On December 10, 2015, prior to receiving a response to his September Letter, Byrd was transferred from SRF to Macomb Correctional Facility (MRF). (Response to Motion for Summary Judgment Ex. L, RE 87-14, PageID# 2154.) On December 29, 2015—over three months after Byrd submitted his religious items and services request—Byrd received a response from Defendant Leach rejecting his request. (Response to Motion for Summary Judgment Ex. N, RE 87-15, PageID# 2161-69.) Leach explained "PD 05.03.150 requires in Paragraph JJ that requests for approval of religious items not already approved by the CFA Deputy Director be submitted in writing to the Warden or designee. . . .[Byrd's] submission is being returned for submission in accordance with PD 05.03.150." (*Id.*).

Notably, Defendant Leach did not require Byrd to change the substance of the letter, the address of the letter, the name the letter was addressed to, or the signature line of the letter. (*Id.*). The *only* requirement that Defendant Leach listed was for Byrd to submit his request to the Warden or designee. (*Id.*) In other words, the request was not defective, the request simply needed to be submitted to the Warden or designee. (*Id.*) Yet unbeknownst to Defendant Leach, Byrd had in fact already submitted his request to the SRF Warden while still housed at SRF. (Response to Motion for Summary Judgment Ex. C, RE 87-4, PageID# 1396, 1398.)

Given his recent transfer, Byrd re-submitted his request to the MRF Warden (Defendant Haas) one week later.[5] (Response to Motion for Summary Judgment Ex. C, RE 87-4, PageID# 1396-97.). Byrd sent the letter addressed to Defendant Haas, with the MRF address, with Byrd's current location at MRF, and with his handwritten signature. (Response to Motion for Summary Judgment Ex. N, RE 87-15, PageID# 2161-69.) Byrd clarified the timeline regarding his religious requests in this letter:

> Enclosed is a petition for the approval of Group Religious Service, person[al] religious property as well as institutional religious property, … I sent a copy of the petition to the CFA Special Activities Coordinator David Leach and he ordered me to first send the petition to my facility's Warden accordance with PD 05.03.150(JJ). I sent one copy to my last facility's warden (SRF) and received no response so a response would be greatly appreciated. I'm enclosing, along with the petition, the order from the CFA Spec. Act. Coord.

(*Id.*)

Because he did not have access to a typewriter at MRF, Byrd enclosed his previous typewritten request from September 2, 2015. (*Id.*; Response to Motion for Summary Judgment Ex. C, RE 87-4, PageID# 1403-04; Response to Motion for Summary Judgment Ex. K, RE 87-12, PageID# 2148-52.) Byrd handwrote "cc" at the bottom of this second request, and listed all the parties that he sent the identical

---

[5] Chaplain White interviewed Byrd sometime in late 2015 and instructed him to submit his religious request to Defendant Haas, thus confirming that Defendant Haas's designee had received Byrd's request in late 2015 as well. (Response to Motion for Summary Judgment Ex. I, RE 87-10, PageID# 1880-81.)

request to: MRF Warden Haas, Special Activities Coordinator Leach, and MDOC

Deputy Director McKee. (Response to Motion for Summary Judgment Ex. N, RE

87-15, PageID# 2161-69.) Therefore, upon receipt, all parties knew that Byrd had

sent the letter to everyone identified by MDOC policy, including (most importantly)

Defendant Haas. (*Id.*). MDOC policy does not restrict prisoners from sending their

request to multiple recipients, simply requiring that the request be at least submitted

to the Warden or designee. (Response to Motion for Summary Judgment Ex. B, RE

87-3, PageID# 1284, 1288 at ¶¶ K, JJ.)

## D. Defendants Failed to Follow MDOC Policy by Continuously Refusing to Consider Byrd's Religious Requests.

Defendant Haas received Byrd's February letter by early March 2016 at the

latest.[6] (Response to Motion for Summary Judgment Ex. N, RE 87-15, PageID#

2161-69; Motion for Summary Judgment, RE 80, PageID# 728). On March 8, 2016,

Defendant Haas etched "FW Submission Pls Discuss W/ Chaplain RH 3-8-16"[7] on

---

[6] Byrd's letter evidences several time-stamped receipts from either the Warden or the Deputy Warden's Office. One time stamp states "received Feb 18, 2016 Deputy Wardens Office." (Response to Motion for Summary Judgment Ex. N, RE 87-15, PageID# 2161-69.) Another time stamp shows "received Mar 08 2016 Deputy Wardens Office." (*Id.*) A third time stamp shows "2016 Mar . . . received Macomb Corr. Facility Warden's Office." (*Id.*) While it is not clear the exact date that the Warden's office and the Deputy Warden's office received Byrd's letter, it was at least received by both offices between February 18, 2016 and March 8, 2016.

[7] Defendants did not produce these documents evidencing Defendant Haas's receipt of Mr. Byrd's correspondence until over two months after Defendant Haas was deposed. No explanation was provided for the delay.

a blank sheet of paper, attached it to Mr. Byrd's request, and sent it to Chaplain White. (Response to Motion for Summary Judgment Ex. N, RE 87-15, PageID# 2161-69.)

However, Defendant Haas never appointed Chaplain White to be his designee for prisoner requests regarding new religious items or services, and Chaplain White was unaware that he was the designee because Defendant Haas never told him that he was. (Response to Motion for Summary Judgment Ex. I, RE 87-10, PageID# 1915-16.) Moreover, none of the prisoners, including Byrd, were made aware of any designee for religious requests. (Response to Motion for Summary Judgment Ex. H, RE 87-9, PageID# 1757-59.) Nonetheless, Byrd's request was properly submitted to the Warden (Defendant Haas), and per policy should have been forwarded to Defendant Leach. (Response to Motion for Summary Judgment Ex. N, RE 87-15, PageID# 2161-69; Response to Motion for Summary Judgment Ex. B, RE 87-3, PageID# 1284, 1288 at ¶¶ K, JJ; Response to Motion for Summary Judgment Ex. I, RE 87-9, PageID# 1757, 1761-62.)

A month passed, and Byrd did not receive a response from Defendants. (Response to Motion for Summary Judgment Ex. C, RE 87-4, PageID# 1431.) Mr. Byrd sent another letter to both Leach and McKee. (Response to Motion for Summary Judgment Ex. U, RE 87-22, PageID# 2291-97; Response to Motion for Summary Judgment Ex. S, RE 87-20, PageID# 2274-79.) McKee and Leach did not

respond. (Response to Motion for Summary Judgment Ex. J, RE 87-11, PageID# 2076-82; Response to Motion for Summary Judgment Ex. C, RE 87-4, PageID# 1459-60.)

Defendant Leach received Byrd's second submission for religious requests and services, however not from Warden Haas, who was apparently still refusing to forward the request as required by policy. (Response to Motion for Summary Judgment Ex. M, RE 87-14, PageID# 2156-58.) On May 13, 2016, Defendant Leach, now receiving this request multiple times, inquired about its status with Chaplain White: "[Byrd] says he has not received any reply from the Warden or you. . . It does not appear that the proposal has been sent through the chain of command; *at least I have not received it yet*." (*Id.*; emphasis added). Defendant Leach then asked Chaplain White to talk to Byrd to confirm that he sent a copy of the request to Defendant Haas, stating "I can have the CAC review it but the proposal has to reach me through the chain of command first." (*Id*)

Following Defendant Leach's direction, Chaplain White interviewed Byrd, made a copy of his proposal, informed Defendant Haas's administrative assistant of the multiple requests, and reported back to Defendant Leach that Byrd had submitted the same request to Defendant Haas without any substantive changes to the letter. (*Id.*; Response to Motion for Summary Judgment Ex. I, RE 87-10, PageID# 1884-87.) Defendant Leach responded: "that should be fine." (Response to Motion for

14

Summary Judgment Ex. M, RE 87-14, PageID# 2156-58.) By May 13, 2016, Defendant Leach not only had knowledge of Byrd's requests, he was also fully aware that Byrd sent the requests to Defendant Haas and that Defendant Haas had a copy. (*Id.*; Response to Motion for Summary Judgment Ex. J, RE 87-11, PageID# 2081.) Still, Defendant Leach failed to submit the request to the CAC or Deputy Director McKee, despite indicating "that should be fine" in reference to Byrd's request. (Response to Motion for Summary Judgment Ex. J, RE 87-11, PageID# 2090-91.)

On July 24, 2016, Byrd wrote another letter (stamped, "received July 25, 2016") to Defendant Haas to seek a status update on his request for religious items and services. (Response to Motion for Summary Judgment Ex. O, RE 87-16, PageID# 2170-72.) Once again, Defendant Haas wrote on a blank piece of paper "Chaplain ? RH 7-29-16" and attached it to Byrd's inquiry regarding the request. (*Id.*) Rather than pass the request to the Defendant Leach—who at the time already had received the request multiple times—Haas again let the request sit. (*Id.*; Response to Motion for Summary Judgment Ex. I, RE 87-10, PageID# 1913-14.) Defendant Haas was aware that it was his duty to escalate the request to the Special Activities Coordinator. (Response to Motion for Summary Judgment Ex. B, RE 87-3, PageID# 1283-1327; Response to Motion for Summary Judgment Ex. H, RE 87-9, PageID# 1757, 1761-62.) Indeed, Defendant Haas even testified that he is required to submit a prisoner's religious items request to the Special Activities Coordinator

15

when he receives it. (Response to Motion for Summary Judgment Ex. H, RE 87-9, PageID# 1761-62.)[8] However, in Byrd's case, he refused to follow policy and did not escalate Byrd's properly submitted request. (Response to Motion for Summary Judgment Ex. N, RE 87-15, PageID# 2161-69; Response to Motion for Summary Judgment Ex. O, RE 87-16, PageID# 2170-72; Response to Motion for Summary Judgment Ex. M, RE 87-14, PageID# 2156-58.)

**E.    Procedural History**

On May 2, 2017, Byrd brought a pro se § 1983 complaint against various officials and employees of the MDOC, claiming violations of RLUIPA, 42 U.S.C. § 2000cc *et seq.*, and the First and Fourteenth Amendments. The district court ultimately disposed of Byrd's claims in three different orders and a final judgment. As to the claims at issue in this appeal, on September 25, 2018, the district court dismissed all of Byrd's claims for damages against Defendant Leach in his individual capacity. (Order, RE 63).[9] An October 19, 2020, order granted summary judgment to Defendant McKee on Byrd's First and Fourteenth Amendment claims and qualified immunity to Defendant Haas on Byrd's First and Fourteenth

---

[8]At the time of Defendant Haas's deposition, Defendants had not produced to Plaintiff's counsel the documents with Defendant Haas's signature evidencing knowledge and receipt. (*See* Response to Motion for Summary Judgment Ex. N, RE 87-15, Page, ID# 2161-72.)  No explanation was given for the delayed production.

[9] The district court's order dismissed other claims as well. Those claims are not at issue in this appeal.

Amendment claims. (Order, RE 109.) Finally, on November 23, 2020, the district court disposed of Byrd's RLUIPA claims and Byrd's Due Process claim against Haas after granting Defendants' motion to reconsider and without allowing Byrd an opportunity to respond. (Order, RE 114.) A final judgment also entered November 23, 2020 ordered "Plaintiff's claims are dismissed with prejudice."[10] (Judgment, RE 115.) Byrd appealed.

## SUMMARY OF ARGUMENT

Defendants' ongoing refusal to consider Byrd's properly submitted requests for group services and necessary religious items violates multiple rights Byrd is guaranteed under federal law. As an initial matter, none of Byrd's claims against Defendants Haas and Leach are moot. The district court erroneously dismissed several claims against these Defendants because Haas and Leach have since retired from MDOC. But Byrd *still* awaits a response to his request, and so the RLUIPA and constitutional violations against these official-capacity offices remain ongoing. Under those circumstances, Federal Rule of Civil Procedure 25(d) instructs that Defendants' successors are automatically substituted as defendants, and so the district court erred in dismissing those claims as moot.

Next, Byrd's RLUIPA claims against Defendants Haas, Leach, and McKee

---

[10] Even though the district court's final judgment dismissed all of Byrd's claims with prejudice, the district court failed to consider Byrd's First and Fourteenth Amendment claims against Defendant Leach on the merits before dismissing them.

should proceed to trial, and the district court was wrong to dispose of those claims on summary judgment. By ignoring Byrd's requests, Defendants have, in effect, completely barred Byrd from the practices and the religious items he requires to practice Ifa. This kind of complete bar is a "substantial burden" under RLUIPA, and Defendants' impermissibly post-hoc and unsupported justifications cannot clear the "daunting" test they must under RLUIPA.  *See, e.g.*, *Cavin v. Mich. Dep't of Corrections,* 927 F.3d 455, 459 (6th Cir. 2019).

Byrd's claims under the First Amendment's Free Exercise Clause against Defendants Haas, Leach, and McKee should go forward. The district court erred when it refused to apply the four-factor test under *Turner v. Safley*, 482 U.S. 78 (1987), to Byrd's free-exercise claims. Properly applying that test, however, demonstrates that genuine fact issues remain as to whether Defendants violated Byrd's First Amendment rights. And further, Byrd's First Amendment rights here are well established, and Byrd should also be permitted to seek monetary damages against Defendants in their individual capacities.

Byrd's Fourteenth Amendment equal protection claims should also proceed. Fact issues remain as to whether Defendants Haas, Leach, and McKee violated Byrd's equal protection rights by denying him, as an Ifa practitioner, the same rights plainly granted under the MDOC policy to adherents of other religions. Byrd alleges that Defendants' differential treatment of him impinges upon a "fundamental right,"

18

which this Court has explained is "presumptively invidious," *see Koger v. Mohr*, 964 F.3d 532 (6th Cir. 2020), so the district court erred in dismissing Byrd's First Amendment claims.

Finally, Byrd's Fourteenth Amendment Due Process claim against Defendant Haas should proceed to trial. Defendant Haas's refusal to forward Byrd's requests for religious accommodation under policy that requires him to do so is an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *See Sandin v. Conner*, 515 U.S. 472, 486-87 (1995). Since Byrd's due process rights here are clearly established, Byrd's official-capacity claim for monetary damages against Defendant Haas should also proceed.

## STANDARD OF REVIEW

"This Court reviews a district court's grant of summary judgment de novo." *Moran v. Al Basit LLC*, 788 F.3d 201, 204 (6th Cir. 2015). This includes a district court's determination of qualified immunity. *See Daugherty v. Campbell*, 935 F.2d 780, 783 (6th Cir. 1991) ("Whether qualified immunity is applicable to an official's actions is a question of law."). Summary judgment is proper only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A material fact is one "that might affect the outcome of the suit," and a genuine dispute exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving

party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## ARGUMENT

### I.    Byrd's claims against Defendants Haas and Leach are not moot.

Under Federal Rule of Civil Procedure 25(d), "[a]n action does not abate when a public officer who is a party in an official capacity dies, resigns, or otherwise ceases to hold office while the action is pending. The officer's successor is automatically substituted as a party." The district court therefore erred when it dismissed as moot Byrd's RLUIPA claims against Defendants Haas and Leach and Byrd's Due Process claim against Haas—Rule 25(d) plainly states that if any of the Defendants in this action leave their post, they are *automatically* substituted as a party.[11]  *See Karcher v. May*, 484 U.S. 72, 83 (1987) ("The rules effectuating automatic substitution of public officers were specifically designed to prevent suits involving public officers from becoming moot due to personnel changes."); *Mumford v. Basinski*, 105 F.3d 264, 273 (6th Cir. 1997) (holding that "personnel changes" did not render an official-capacity suit moot); *see also McDaniel v.*

---

[11] Accordingly, both Defendants Haas and Leach should be automatically substituted with their successors with respect to Byrd's claims for injunctive relief in their official capacities.  Further, Byrd had no opportunity to respond to Defendants' motion for reconsideration before the district court's dismissal. *See* E.D. Mich. Local R. 7.1(h) ("No response to the motion and no oral argument are permitted unless the Court orders otherwise.").  Byrd was thus not permitted a response on this issue before the district court granted Defendants' motion for reconsideration and dismissed the case entirely.

*Precythe*, 897 F.3d 946, 951 (8th Cir. 2018) (official-capacity suit not moot when successor "ha[d] not announced new policies or represented to this court that she will depart from the policies of her predecessor"); *Horacek v. Heyns*, No. 2:13-CV-280, 2016 WL 11263235, at *3 (W.D. Mich. Dec. 15, 2016) (§ 1983 claim not moot when defendants left MDOC).

An official-capacity action is moot when a defendant leaves their position only "[w]here the successor does not intend to pursue the policy of his predecessor which gave rise to the lawsuit[.]" *See* Rule 25 Advisory Committee Notes. But the conduct Byrd alleges against the Warden, Defendant Haas, and the Special Activities Coordinator, Defendant Leach, still persists even after both Defendants retired from MDOC. Neither of their predecessors have announced—let alone actually implemented—a change in policy such that violations against Byrd's rights are no longer ongoing. *See McDaniel*, 897 F.3d at 951.[12]  Byrd's claims, therefore, are decidedly *not* moot, and the district court was wrong to dismiss them on those grounds. *See Mumford*, 105 F.3d at 273. This Court should reverse the district court's erroneous mootness determination.[13]

---

[12] Indeed, a July 2019 written request for the same items, made through counsel and specifically reserving Byrd's rights in this lawsuit, has gone ignored and unanswered.

[13] And, for the reasons explained below, Byrd is also entitled to proceed on these claims based on the underlying merits of the claims.

## II. Byrd's RLUIPA claims against Defendants Haas, Leach, and McKee should proceed to trial.

The district court erred in disposing Byrd's RLUIPA claims on summary judgment against Defendants Haas, Leach, and McKee, and those claims should proceed on the merits. Before the district court erroneously dismissed Byrd's RLUIPA claims against Haas and Leach solely on mootness grounds, the Magistrate had recommended that those claims should proceed. (Report & Recommendation, RE 98.) The Magistrate's call was the right one, and this Court should reverse and remand those claims for the reasons discussed below. As for Defendant McKee, the district court erred when it concluded that summary judgment was warranted because "[t]here is no evidence Defendant McKee ever received a request from Byrd through the proper channels set out in Policy Directive 05.03.150." (Order, RE 114, PageID# 3131.) There remain, at least, fact issues as to whether McKee, in his role as the ultimate decisionmaker, is nonetheless liable under RLUIPA for his role in allowing Byrd's straightforward request to go unanswered for five years.

RLUIPA provides "broad protection for religious liberty," *Holt v. Hobbs*, 574 U.S. 352, 357 (2015), and it extends greater protection to inmates than the First Amendment. *See Fox v. Washington*, 949 F.3d 270, 277 (6th Cir. 2020). As this Court has explained, RLUIPA claims are a "three-act play." *Cavin v. Michigan Dep't of Corr.*, 927 F.3d 455, 458 (6th Cir. 2019). First, Byrd "must demonstrate that he seeks to exercise religion out of 'sincerely held religious belief.'" *Id.* (quoting

22

*Holt*, 574 U.S. at 360-61.). Second, Byrd "must show that the government substantially burdened that religious exercise." *Id.* (citation omitted). Finally, "the government must meet the daunting compelling-interest and least-restrictive means test." *Id.* (citation omitted). "Religious exercise" must be "construed in favor of a broad protection of religious exercise, to the maximum extent permitted by the terms of [RLUIPA] and the Constitution." 42 U.S.C. § 2000cc-3(g).

### A.    Byrd's religious beliefs are sincerely held.

Byrd has more than established his sincere commitment to Ifa.[14]  Byrd has practiced Ifa since 2015, and he's never changed his religious designation since becoming an Ifa practitioner. (Response to Motion for Summary Judgment Ex. A, RE 87-2, PageID# 1281.) Byrd received his "select head"[15] assignment through divination practiced by a fellow inmate Ifa practitioner, DeAngelo Williams. (Response to Motion for Summary Judgment Ex. C, RE 87-4, PageID# 1466.) Byrd brought this suit so that he may properly practice Ifa. *See Fox*, 949 F.3d at 278 (recognizing that maintenance of a lawsuit may support a finding of sincere religious

---

[14] Indeed, up until their objections to the Magistrate Judge's final report and recommendation, Defendants did not even contest that Byrd's beliefs were sincere. (Defendants' Objections to Report & Recommendation, RE 103, PageID# 2716.) And, even at that point, they simply noted that they did not "waive" their ability to do so, having nothing substantive to actually say on the point.

[15] A "select head" is an individual's particular Orisha which guides the person's consciousness through life, and is required as part of the process of converting to Ifa. (Response to Motion for Summary Judgment, RE 87-4, PageID# 1464-66.)

23

belief). Byrd also testified that he gained knowledge of Ifa by reading book after book on the subject, and by seeking out oral instruction from other Ifa practitioners. (Response to Motion for Summary Judgment Ex. C, RE 87-4, PageID# 1373-77, 1464.)

When asked what the Ifa faith means to him, Byrd testified that it has taught him respect for nature and for his elders. (*Id.* at 1472.) He elaborated: "Personally for me the practice of my religion is integral to my rehabilitation. It's my source of solace and comfort and with . . . what can be extremely difficult times in here . . . It provides solace . . . . a level of comfort[.]" (*Id.* at 1471-72.)[16] Byrd has met his burden to satisfy this element.

### B.    Defendants substantially burdened Byrd's rights.

"The substantial-burden test asks whether the Government is effectively forcing plaintiffs to choose between engaging in conduct that violates sincerely held religious beliefs and facing a serious consequence." *New Doe Child # 1 v. Congress of United States*, 891 F.3d 578, 589 (6th Cir. 2018). "[T]he Government substantially burdens an exercise of religion when it places substantial pressure on an adherent to

---

[16] Byrd's deposition is packed full of his own personal knowledge and belief in Ifa. (*See, e.g*, Response to Motion for Summary Judgment Ex. C, RE 87-4, PageID# 1407-28 (explaining the significance of each requested religious item and explaining the number of Orisha, the names and meaning of each Orisha, and the necessity of religious herbs to the practice of invoking individual Orisha)).

modify his behavior and to violate his beliefs or effectively bars has sincere faith-based conduct." *Id*. Byrd has met his burden under this test.

### 1.    Denial of Group Services for Ifa

Although the MDOC policy currently recognizes Ifa, it specifically does not allow Ifa group services. Byrd requested group services (and items necessary for those services) on September 2, 2015, February 2, 2016, March 9, 2016, May 13, 2016 (in person), July 24, 2016, and most recently July 22, 2019. Each of these requests was ignored, and Defendants collectively refused to send Byrd's requests through the process mandated by policy.

Ifa requires group services. (Response to Motion for Summary Judgment Ex. E, RE 87-6, PageID# 1635.) During a typical Ifa group service, there is dancing, drumming, singing, and invocation of the Orishas and various ancestors. (*Id.* at 1636-37.) Candles are required, and various herbs are burned and smudged on the practitioners to cleanse negative energy. (*Id.*) Water is also used to clear negative energy, as well as to make offerings to the Orisha and ancestors. (*Id.* at 1638.)

But under the MDOC policy, Ifa practitioners are completely barred from conducting or attending group services. (Response to Motion for Summary Judgment Ex. B, RE 87-3, PageID# 1322.) This categorical bar is a "substantial burden" under RLUIPA: "The greater restriction (barring access to the practice) includes the lesser one (substantially burdening the practice)." *Haight*, 763 F.3d at

565. By completely denying Byrd the ability to worship in a group setting, Defendants effectively prohibit any opportunity Byrd has to access and practice this part of his faith. This type of burden meets RLUIPA's standard: "Barring group worship and preventing access to supplies burdens [the practitioner's] religious exercise." *Cavin,* 927 F.3d at 459; *see also Fox*, 949 F.3d at 279-80 (finding complete denial of group services to be a substantial burden).[17]

### 2.    *Denial of Necessary Religious Personal Items*

MDOC policy does not permit Ifa practitioners many of the items necessary to practice Ifa. Specifically, Byrd requests four kola nuts, a straw mat or sheet, an Elegba head, Ileke and Ide beads, candles, access to specific herbs, and song and prayer books. (Response to Motion for Summary Judgment Ex. K, RE 87-12, PageID# 2148-52; Response to Motion for Summary Judgment Ex. N, RE 87-15, PageID# 2161-69; Response to Motion for Summary Judgment Ex. T, RE 87-21, PageID# 2281-89.) Byrd requested approval of these items on September 2, 2015, February 6, 2016, March 9, 2016, May 13, 2016 (in person), July 24, 2016, and most

---

[17] This Court has also been clear that an inmate's ability to practice in their cell doesn't negate the "substantial burden" imposed by the denial of group services. *Cavin*, 927 F.3d, at 459 ("What of a second-best option: celebrating in his cell? That approach reframes the nature of what Cavin seeks to do: worship with others according to his beliefs. When determining the substantiality of a burden, we cannot look to whether the RLUIPA claimant is able to engage in other forms of religious exercise."); *see also Fox*, 949 F.3d at 280-81.

recently, July 22, 2019 (through counsel). Each of these requests were ignored, and Defendants collectively refused to send Byrd's requests through the process mandated by policy.

Again, Ifa practitioners believe in the necessity of communing with their ancestors and the Orisha, and they do so through a process called divination. Ifa practitioners must divine, and divination requires Ifa practitioners to cast cowrie shells affixed to coconut shells or kola nuts onto a divination tray called an "Opon Ifa." (Response to Motion for Summary Judgment Ex. E, RE 87-6, PageID# 1625-26.) Divination must be conducted with a mat or cloth protecting the divination from the ground. (*Id.* at 1628-29.) The practitioners read the combination of results from the cast to divine answers from the Orisha. (*Id.*) Similarly, practitioners use herbal baths (using a variety of herbs) in order to properly invoke particular Orisha. (*Id.* at 1629-30.) Ifa practitioners also believe that a small wooden or stone "Elegba head" is a representation of the divine messenger, Esu, who is necessary to facilitate communication with the Orisha. (Response to Motion for Summary Judgment Ex. C, RE 87-4, PageID# 1408.) Ifa practitioners also require a set of necklace and bracelet beads called Ileke and Ide beads, which offer spiritual protection and facilitate communication with the Orisha during divination. (Response to Motion for Summary Judgment Ex. E, RE 87-6, PageID# 1630-38; Response to Motion for

Summary Judgment Ex. K, RE 87-12, PageID# 2148-52; Response to Motion for Summary Judgment Ex. C, RE 87-4, PageID# 1407-10, 1416-22.)

The denial of these items substantially burdens Byrd's right to practice Ifa. Presently, Byrd's only option is to use "makeshift" items to practice Ifa—and those makeshift items are not officially approved by MDOC policy, so they are considered contraband and could be destroyed at any time. (Response to Motion for Summary Judgment Ex. C, RE 87-4, PageID# 1438-39, 1472-73.) Further, Byrd explained that these makeshift items put him as risk of discipline for possessing "contraband." (*Id.* at 1473.) Byrd explained why he takes this risk: "Because my religious practice is important to me . . . and I feel that . . . if every other religious group is allowed to practice their religion without fear of misconduct I want to be able to do so myself, so it's a necessary risk for me to take." (*Id.*).[18]

This kind of choice is a substantial burden: "The substantial-burden test asks whether the Government is effectively forcing plaintiffs to choose between engaging in conduct that violates sincerely held religious beliefs and facing a serious consequence." *New Doe*, 891 F.3d at 589. By forcing Byrd to either forgo practicing Ifa because necessary religious articles are not authorized or create makeshift items (considered contraband) in order to practice Ifa, Defendants are creating *exactly* the

---

[18]Additionally, the fact that Byrd would rather risk misconduct and punishment than give up his religious views is further evidence of his sincere belief.

substantial burden prohibited by RIULPA. *See Holt*, 574 U.S. at 360-61 (choice of shaving religiously mandated beard or discipline is a substantial burden); *see also Haight*, 763 F.3d at 564. Such an impossible choice is the very essence of a "substantial burden."

      3.    *Each Defendant has burdened Byrd's RLUIPA rights.*

*Defendant Haas.* Under the MDOC policy, Defendant Haas, as the warden, has a *mandatory* obligation to forward religious requests up the chain of command. (Response to Motion for Summary Judgment Ex. B, RE 87-3, PageID# 1288.) It is undisputed that he received Byrd's written requests multiple times, but refused to advance the request up the chain of command as required, serving as an immovable and irrational roadblock. Haas effectively denied Byrd the right to practice Ifa. *See New Doe*, 891 F.3d at 589.

*Defendant Leach.* Defendant Leach, too, has substantially burdened Byrd's RLUIPA rights. Leach was well aware of Byrd's plight—there's no dispute that Leach himself had received Byrd's request multiple times. (Response to Motion for Summary Judgment Ex. J, RE 87-11, PageID# 2066-91.) Leach not only knew about Byrd's requests, but he inquired about the status of Byrd's request with Chaplain White, asked White to confirm with Byrd that he'd submitted his request to Defendant Haas, and ultimately stated that the request Byrd had submitted to Defendant Haas "should be fine." So, Leach was fully aware that Byrd had submitted

his requests to Defendant Haas, and yet he failed to submit the request to Defendant McKee or the CAC. This substantially burdened Byrd's RLUIPA rights.

*Defendant McKee.* The district court concluded that McKee was not liable under RLUIPA as a matter of law because there was no dispute that he never received a request through the "proper channels." (Order, RE 114, PageID# 3131.) But that's not Byrd's fault, and the record shows that Byrd sent multiple requests and letters to Defendant McKee in order to make McKee aware that his religious rights were at stake. Yet, McKee did nothing, despite the fact that the ultimate authority to grant requests like Byrd's indisputably lies with McKee. (Response to Motion for Summary Judgment Ex. B, RE 87-3, PageID# 1284, 1288; Response to Motion for Summary Judgment Ex. Q, RE 87-18, PageID# 2218-19.) In other words, Byrd, through his letters, informed McKee several times that his religious rights were being unfairly burdened by Defendant Haas's stubborn and irrational inaction, and McKee did nothing. Taking the evidence in the light most favorable to Byrd, there are fact issues as to whether Defendant McKee substantially burdened Byrd's rights.

In sum, there is no dispute here that Byrd has yet to receive a response to his repeated requests for access to necessary religious items and group services—he has been effectively denied all access to his ability to practice Ifa. This is a "substantial

30

burden," *Haight*, 763 F.3d at 565, and Byrd's claims should proceed against Defendants Haas, Leach, and McKee should proceed.

### C. The Defendants cannot satisfy the "daunting" compelling-interest and least-restrictive-means test.

Finally, Defendants cannot—especially not at the summary judgment stage—meet their burden to satisfy "the daunting compelling-interest and least-restrictive means test." *See Cavin*, 927 F.3d at 458; § 2000cc–1(a). "RLUIPA … contemplates a more focused inquiry and requires the Government to demonstrate that the compelling interest test is satisfied through application of the challenged law to the person—the particular claimant whose sincere exercise of religion is being substantially burdened." *Holt*, 574 U.S. at 362-63 (quoting *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 726 (2014) (internal citations and quotation marks omitted)). In other words, the Defendants' refusal to consider Byrd's request must pass "strict scrutiny." *Cavin*, 927 F.3d at 459; *see also Holt*, 574 U.S. at 363.

Defendants cannot meet this "daunting" strict-scrutiny standard. To the contrary—in response to the district court's concern that it would seem "sort of, a hollow right" if MDOC "wouldn't be obligated in any fashion to process [Byrd's] requests," counsel for Defendants' replied that "it's long established how prisons enforce their rules and the reasons why are best left to the prisons. The courts don't really support inserting themselves on how that is to be done." (Transcript, RE 99, PageID# 2630-31.) In other words, it is Defendants' view that MDOC need not *ever*

31

respond to Byrd's request that it accommodate Byrd's religious rights under the guise of prison management. This is nowhere near the exacting standard RLUIPA requires.

Defendants other "justifications" for ignoring Byrd's requests also reflect that same degree of flippancy toward Byrd's religious rights. Defendants explained to the district court that they ignored Byrd's requests due to his supposed failure to comply with hyper-technical formatting requirements that appear nowhere in MDOC's actual policy. For example, Defendants faulted Byrd for his temerity to "copy" additional recipients on his requests—claiming, without basis, that the policy required Byrd to submit his group service and religious item requests "in writing *only* [to] their warden or his designee." (Motion for Summary Judgment, RE 80, PageID# 736-37 (emphasis added)). Defendants also insisted at various points in the litigation below that Byrd's request must be handwritten by him, that it must be on specific letterhead, and that it must explain the dimensions, materials, and other specific details regarding the items he claims are necessary. (*See* Defendants' Objections to Report & Recommendation, RE 103).

The actual policy requires *nothing* of the sort. "[Religious Personal Property] requests must be submitted in writing to the Warden or designee and include a description of the religious item along with an explanation of its significance to the prisoner's designated religion." Nothing in this policy statement forbids a prisoner

from sending his religious item/group services request to other individuals in the MDOC, including those higher on the "chain of command." (Response to Motion for Summary Judgment Ex. B, RE 87-3, PageID# 1284, 1288 at ¶¶ JJ, K.) Instead, the burden of following the "chain of command" is placed squarely *on the Warden*, not the prisoner. (*See id.*). The prisoner's responsibility is therefore satisfied the moment he sends a written request to the Warden.

In any event, Byrd fulfilled his obligations. He first sent his written requests on September 2, 2015, to Defendant Leach, and his then-Warden at the SRF. (Response to Motion for Summary Judgment Ex. K, RE 87-12, PageID# 2148; Response to Motion for Summary Judgment Ex. C, RE 87-4, PageID# 1388.) When he was transferred to MRF, Byrd complied with Defendant Leach's instruction to send the request again to Defendant Haas. (Response to Motion for Summary Judgment Ex. C, RE 87-4, PageID# 1396-97; Response to Motion for Summary Judgment Ex. N, RE 87-15, PageID# 2161-69.) In his letter to Haas (which contained a full copy of his detailed September Letter), Byrd specifically noted this history. (Response to Motion for Summary Judgment Ex. N, RE 87-15, PageID# 2161-69.) At this point, Byrd had fully complied with his obligations under MDOC policy.

Indeed, Defendant Haas even acknowledged receiving Byrd's request, forwarding it to his Chaplain on March 8, 2016. (Motion for Summary Judgment,

RE 80, PageID# 728; Response to Motion for Summary Judgment Ex. N, RE 87-15, PageID# 2161-69.) So by March 2016, Defendant Haas certainly knew that Byrd had requested religious articles and group services. When silence was his only response from Defendant Haas, Byrd followed up again by sending another letter inquiring as to the status of his request. (Response to Motion for Summary Judgment Ex. U, RE 87-22, PageID# 2291-97; Response to Motion for Summary Judgment Ex. S, RE 87-20, PageID# 2274-79.) Mr. Leach responded by sending an email to Chaplain White, who then: (1) acknowledged receipt of Mr. Byrd's request, (2) interviewed Mr. Byrd, (3) made a copy of his proposal, (4) informed Defendant Haas's administrative assistant of the multiple requests, and (5) reported back to Defendant Leach regarding his actions. (Response to Motion for Summary Judgment Ex. M, RE 87-14, PageID# 2156-58; Response to Motion for Summary Judgment Ex. I, RE 87-10, PageID# 1884-87.) Defendant Leach responded that "that should be fine." (Response to Motion for Summary Judgment Ex. M, RE 87-14, PageID# 2156-58.) But Byrd's requests still lingered without action, so Byrd tried again by sending another letter to Defendant Haas. (Response to Motion for Summary Judgment Ex. O, RE 87-16, PageID# 2170-72.) Defendant Haas continued to ignore Byrd's request. (*Id.*).

In other words, Byrd sent the same religious item and religious group requests *multiple times* to Defendant Haas and Chaplain White, who both acknowledged

receipt, but took no action. He further sent these same religious requests to Defendant Leach, who also acknowledged receipt, spoke with Chaplain White about the requests, stated that the requests "should be fine," but also took no further action. Byrd therefore complied with MDOC policy.

What's more, Defendants have tried to justify their head-in-the-sand approach by saying that this policy serves the penological interest of "maintaining the safety, security, and good order" of the prison. (Motion for Summary Judgment, RE 80, PageID# 737). But that justification popped up for the first time *after* Byrd brought this lawsuit, and even if requiring Byrd to comply with unwritten formatting rules fit tightly enough to MDOC's security concerns to satisfy strict scrutiny, that kind of post-hoc justification won't fly under RLUIPA. This Court has repeatedly held that "explanations offered for the first time in litigation ought to come with a truth-in-litigating label, requiring the official to disclose whether the new explanations motivated the prison officials at the time of decision or whether they amount to post hoc rationalizations. *Only the true explanations for the policy count*." *Haight*, 763 F.3d at 562 (emphasis added). There is no record evidence that Defendants *ever* considered *any* contemporaneous security concerns raised by Byrd's request—they didn't. Defendant McKee, in fact, explained that he's *never* done a security analysis for *any* religious accommodation request. (Response to Motion for Summary Judgment Ex. Q, RE 87-18, PageID# 2218-19.) Neither Defendants' claim that

35

Byrd's request was defective nor their emphasis on "security concerns" can satisfy RLUIPA's "daunting" strict scrutiny test.[19] *Id.*; *Fox*, 949 F.3d, at 283.

## III.  Byrd's Free Exercise Claims against Defendants Haas, Leach, and McKee Should Proceed.

The district court also erred by disposing of Byrd's First Amendment Free Exercise claims on summary judgment.  There is, at a minimum, a fact dispute as to whether the Defendants unconstitutionally violated Byrd's free exercise rights—and whether they did so in violation of clearly established federal law. The district court's primary error was its failure to apply the appropriate *Turner v. Safley* test to Byrd's claim against Defendant Haas, wrongly concluding instead that Byrd failed to show that Haas's  inaction was "anything more than either an isolated incident or the result of confusion or miscommunication."  (Order, RE 109, Page ID # 3062.) The district court also erred when it dismissed the claims against Defendants Leach and McKee because fact disputes remain as to whether those Defendants violated Byrd's free exercise rights. Finally, Byrd's free exercise rights here are clearly

---

[19] Neither, as Defendants also claimed at the district court, can their actions be justified because granting Byrd's request would "impact … the prison population of over 30,000 offenders." (Motion for Summary Judgment, RE 80, PageID# 738). Once again, this Court has rejected this exact line of reasoning as "the classic rejoinder of bureaucrats throughout history," noting that such argument has "no place as a stand-alone justification under RLUIPA." *Haight*, 763 F.3d, at 562.

established, and the district court also erred in granting the Defendants qualified immunity.

### A. Summary judgment on Byrd's free exercise claims was erroneous.

"Prison walls do not form a barrier separating prison inmates from the protections of the Constitution." *Turner v. Safley*, 482 U.S. 78, 84 (1987). "In any free exercise claim, the first question is whether the belief or practice asserted is religious in the plaintiff's own scheme of things and is sincerely held."[20] *Maye v. Klee*, 915 F.3d 1076, 1083 (6th Cir. 2019) (brackets and citation omitted). Then, "[i]n considering a challenge to a prison policy as applied, the proper inquiry is whether the actions of the prison officials are reasonably related to legitimate penological interests." *Flagner v. Wilkinson*, 241 F.3d 475, 483 (6th Cir. 2001) (citations omitted).

The four-factor *Turner* analysis determines "whether a prison regulation is reasonably related to legitimate penological interests." *Id.* (citations omitted). "Under the first factor, the court must consider whether there is 'a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it.'" *Id.* (quoting *Turner*, 482 U.S. at 89). "[A] regulation cannot be sustained where the logical connection between the regulation and the

---

[20] For all the reasons discussed above, supra Part II.A., Byrd has demonstrated that his beliefs are sincerely held.

asserted goal is so remote as to render the policy arbitrary or irrational." *Id.* (quoting *Turner*, 482 U.S. at 89-90).

The three remaining *Turner* factors are "balanced together." *Id.* The second factor asks "whether there are alternative means of exercising the right that remain open to prison inmates." *Id.* The third assesses "the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally." *Id.* And the fourth considers, "the absence of ready alternatives [as] evidence of the reasonableness of a prison regulation." *Id.*

The district court, however, erred by refusing to apply this test to Byrd's as-applied claim determining without explanation that "[r]eliance on *Turner* was misplaced because Byrd did not challenge the facial validity of the MDOC Regulation." (Order, RE 109, PageID#3061-62.) That was in error. This Court in *Flagner* applied *Turner*'s test to an as-applied challenge, and this Court has continued to do so. *Id.* at 484 n.5 (explaining that *Turner* controls as-applied challenges); *see also Figel v. Overton*, 121 F. App'x 642, 646 (6th Cir. 2005) ("Under *Turner*, a plaintiff may pursue as-applied challenges to facially valid prison regulations." (quoting *Flagner*, 241 F.3d at 484 n.5 (brackets omitted))). Applying the proper test under *Turner* demonstrates that summary disposition on Byrd's free exercise claims is unwarranted.

38

1.    *Defendants fail the first* Turner *factor.*

Defendants cannot show that their refusal to consider Byrd's request under the MDOC policy bears a "rational connection" to any "legitimate governmental interest." *Flagner*, 241 F.3d at 484 (citation omitted). Defendants, therefore, cannot make the threshold showing at this first *Turner* factor. *See id.* ("[A] regulation cannot be sustained where the logical connection between the regulation and the asserted goal is so remote as to render the policy arbitrary or irrational.").

The evidence in the record, taken in the light most favorable to Byrd, shows that there is *no* "rational connection" to *any* "legitimate governmental interest" for the simple reason that Defendants have simply *ignored* Byrd's request—despite a mandatory policy requiring Defendants to address it. As a result, Byrd is completely unable to attend group Ifa services, and neither can he possess the religious articles necessary for his personal practice of Ifa. At the district court, Defendants tried to explain their failure by pointing to supposed unwritten technocratic requirements, rather than acknowledging that they had received the written "description of the religious item[/group services]" required by policy. (Response to Motion for Summary Judgment Ex. B, RE 87-3, PageID# 1284, 1288 at ¶¶ JJ, K). When Byrd re-sent his requests, and followed up multiple times over months, Defendants continued to ignore him and refused to consider his requests for religious accommodation. They had every opportunity to correct their inaction, but instead

they chose to ignore Byrd's rights. This stubborn inaction is not a "rational connection" to a legitimate government interest—it's a wholesale derogation of Byrd's constitutional rights.

>2.     *Defendants cannot meet the remaining three* Turner *factors.*

None of the remaining *Turner* factors cut in Defendants' favor either. *See Flagner*, 241 F.3d at 484. Defendants cannot point to any "alternative means of exercising the right that remain open to prison inmates." *Id.* (quoting *Turner*, 482 U.S. at 90.) Without approval of group services, Ifa practitioners like Byrd cannot attend or worship in a group, even though it is an Ifa requirement. (Response to Motion for Summary Judgment Ex. E, RE 87-6, PageID# 1635-36.) Similarly, without approval of Byrd's requested religious items, he cannot fully practice his religion, and he risks punishment for attempting to do so. (Response to Motion for Summary Judgment Ex. C, RE 87-4, PageID# 1473.)

Next, "the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally," *id.*, is minimal here.  MDOC already allows inmates from other religions to attend group services and possess personal religious property, many articles of which are similar in size and content to what Byrd requests.[21]

---

[21] Many of the items sought by Byrd are already allowed by other religions. (Response to Motion for Summary Judgment Ex. B, RE 87-3, PageID# 1294-96,
*Continued on next page.*

Finally, there are "obvious, easy alternatives" here. *Flagner*, 241 F.3d at 484 ("[T]he existence of obvious, easy alternatives may be evidence that the regulation is not reasonable, but is an exaggerated response to prison concerns." (citation and internal quotation marks omitted)). Defendants have an obvious alternative: simply follow the plain written language of MDOC policy and consider Byrd's requests. They could also easily allow Mr. Byrd's requested religious personal items and group services on the same terms they already extend to the greater inmate population. They chose not to do so.

Therefore, under the *Turner* test, there is therefore at minimum a genuine fact dispute as to whether Defendants Haas, Leach, and McKee unconstitutionally burdened Byrd's free exercise rights. Defendant Haas repeatedly ignored his mandatory duty to forward Byrd's request up the chain of command. Defendant

---

1322. ) For example, Native American's are allowed certain herbs and a medicine bag for smudging. (*Id.* at 1294-96.). Similarly, Byrd seeks herbs for smudging as required for the practice of his religion. (Response to Motion for Summary Judgment Ex. K, RE 87-12, PageID# 2148-2152; Response to Motion for Summary Judgment Ex. C, RE 87-4, PageID# 1419-20; Response to Motion for Summary Judgment Ex. E, RE 87-6, PageID# 1629.) Additionally, MDOC allows Muslim practitioners a prayer mat, and necklace with a pendant. (Response to Motion for Summary Judgment Ex. B, RE 87-3, PageID# 1294-96.). Other practitioners are allowed religious necklaces as well, all with the same dimensions and specifications. (*Id.*) Similarly, Byrd seeks a prayer rug and a beaded necklace as required for the practice of his religion. (*See* Response to Motion for Summary Judgment Ex. K, RE 87-12, PageID# 2148-52; Response to Motion for Summary Judgment Ex. D, RE 87-5, PageID# 1480-81.) Most of Byrd's requests follow this pattern. (*See* Response to Motion for Summary Judgment Ex. K, RE 87-12, PageID# 2148-52.)

Leach, having received Byrd's request multiple times, was well aware that Byrd's rights were at stake and stymied by Haas's inaction—and yet did nothing. Finally, Defendant McKee, as Deputy Director, ultimately bore responsibility to approve religious-accommodation requests, and Byrd's straightforward request has languished for five years under his watch. Byrd notified McKee multiple times that his requests were being ignored—and yet McKee also ignored Byrd. *See* supra Part II.B.3.

### B.    Defendants are not entitled to qualified immunity.

"Government officials sued in their individual capacities for constitutional violations are free from liability for civil damages unless (1) they violate a constitutional right that (2) was clearly established at the time that it was violated." *Morgan v. Fairfield Cnty, Ohio*, 903 F.3d 553, 560 (6th Cir. 2018). "A defendant cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it." *Id.* (citations omitted). The Supreme Court has cautioned that while it is not required for there to be a case "directly on point for a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate." *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018) (citation omitted).  While previous cases with facts that are "'fundamentally similar' can provide especially strong support for a conclusion that the law is clearly

established, *they are not necessary to such a finding*." *Hope v. Pelzer*, 536 U.S. 730, 741 (2002) (emphasis added). In short, "contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Stoudemire v. Michigan Dep't of Corr.*, 705 F.3d 560, 568 (6th Cir. 2013) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). Courts may address the two elements of qualified immunity in any order. *Morgan*, 903 F.3d at 560.

Defendant Haas, Leach, and McKee are not entitled to qualified immunity on Byrd's free exercise claims for monetary damages. It is black-letter constitutional law that, "[w]here an inmate's religious freedom is at stake, correctional officials may only adopt regulations which are 'reasonably and substantially' justified by official concern for internal security and inmate discipline." *Maye*, 915 F.3d at 1083 (quoting *Brown v. Johnson*, 743 F.2d 408, 411-12 (6th Cir. 1984)). Taken most favorably to Byrd, the record shows that Defendants *knew* that Byrd's "religious freedom [was] at stake," because there is no dispute that Defendants Haas and Leach were well aware of Byrd's requests.[22] And it's clearly established that when religious freedom is in jeopardy, prison officials must justify that burden under legitimate penological objectives.

---

[22] And, as to McKee, there is at least a fact dispute as to whether McKee knew Byrd's rights were being violated. *See supra* Part II.B.3.

In other words, any reasonable prison official would have known that they could only burden Byrd's rights to practice Ifa if those burdens could be "justified by official concern for internal security and inmate discipline." *Maye*, 915 F.3d at 1083. But because the Defendants have simply refused to even *consider* Byrd's request, they had no way of knowing whether denying Byrd's request to practice Ifa was constitutionally warranted. A "reasonable official" would have known that the risk of ignoring—*for years*—a straightforward request for religious accommodation would run the risk of violating Byrd's clearly established free exercise rights. *See Stoudemire*, 705 F.3d at 568.

Further, not only is it "clearly established" that Defendants could only burden Byrd's rights under a justifiable policy, this Court has also held that it is "clearly established" that a "policy totally banning religious oils implicated the First Amendment" such that it would have to be "justified by legitimate penological concerns." *Munir v. Scott*, 12 F.3d 213 (Table) (6th Cir. 1993) (citing *Brown*, 743 F.2d at 411-12). It is also "clearly established" that "[b]arring group worship and preventing access to supplies burdens … religious exercise." *Cavin*, 927 F.3d at 459.

Byrd's "religious freedom [was] at stake," *Brown*, 743 F.2d at 411-12, meaning that a policy restricting it needed to be justified by "legitimate penological interests," *Maye*, 915 F.3d at 1083. Defendants knew Byrd's rights were at stake, but because they ignored Byrd's requests they never evaluated whether this de facto

denial could be justified by "legitimate penological interests." *Id.* Qualified immunity is therefore unwarranted and Byrd's claims for monetary damages against the Defendants in their individual capacities should proceed.

## IV.    Byrd's Fourteenth Amendment Equal Protection claims should proceed.

The district court erroneously disposed of Byrd's Fourteenth Amendment Equal Protection claims against Defendants Haas, Leach, and McKee. Byrd claims that the Defendants violated his equal-protection rights because the MDOC policy permits practitioners of other religions to possess essentially the same items that Byrd is denied as an Ifa believer. In granting summary judgment to the Defendants, the district court determined that Byrd failed to show "intentional or purposeful discrimination." (Order, RE 109.) But this Court has plainly and recently held, "classifications that … impinge upon the exercise of a fundamental right" are "presumptively invidious." *Koger v. Mohr*, 964 F.3d 532, 544 (6th Cir. 2020). Byrd's right to practice his faith is a "fundamental" one, and therefore the unconstitutional classification imposed on him here is "presumptively invidious." *Id.* All of Byrd's equal protection claims against Haas, Leach, and McKee should therefore proceed.

### A.    Defendants violated Byrd's Equal Protection rights.

Under the Fourteenth Amendment, the state may not "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV §1.

45

"The Clause embodies the principle that all persons similarly situated should be treated alike." *Scarbrough v. Morgan Cty Bd. of Educ.*, 470 F.3d 250, 260 (6th Cir. 2006). "[T]o establish an equal protection violation, a plaintiff must establish more than differential treatment alone—a discriminatory intent or purpose is required. *However, we treat as presumptively invidious those classifications that disadvantage a suspect class, or that impinge upon the exercise of a fundamental right*." *Koger*, 964 F.3d at 544 (citations and internal quotation marks omitted) (emphasis added). Therefore, in these circumstances the court can only sustain the law if it is "suitably tailored to serve a compelling state interest." *Harbin-Bey v. Rutter*, 420 F.3d 571, 576 (6th Cir. 2005) (internal quotes omitted). Viewed in the light most favorable to Byrd, Defendants actions violated Byrd's equal-protection rights.

In *Koger*, this Court permitted a prisoner's equal protection claim to proceed when the prison allowed Muslims to fast, but not Rastafarians. 964 F.3d at 544. The plaintiff in *Koger*, as a Rastafarian, was denied the opportunity fast during Rastafarian fast days, and he explained that he had "fasted during Ramadan in the past because it occasionally aligns with the fasting days observed by Rastafarianism." *Id.* This Court held that this was a "facially discriminatory distinction between" the two religions—such that it "would burden [the plaintiff's] fundamental rights … which means an invidious purpose may be inferred." *Id.*

46

(quoting *Maye*, 915 F.3d at 1086); *Maye*, 915 F.3d at 1086 (same); *see also Cruz v. Beto*, 405 U.S. 319, 322 (1972) (holding that if plaintiff "was denied a reasonable opportunity of pursuing his faith comparable to the opportunity afforded fellow prisoners who adhere to conventional religious precepts, then there was palpable discrimination by the State[.]").

Byrd's circumstances mirror *Koger*. To practice Ifa, Byrd requires, among other things, a mat, herbs for smudging and herbal baths, and a religious necklace. MDOC's policy already permits these items—but only for adherents of other religions. For example, the MDOC policy permits followers of Islam, the Church of Christ Scientist, Judaism, Protestant Christianity, Roman Catholicism, Seventh Day Adventism, Wiccans, and Hinduism all to possess some kind of religiously significant neckware—but does not permit the same for Ifa practitioners. (Response to Motion for Summary Judgment Ex. B, RE 87-3, PageID# 1294-1300, 1321.) Muslims and Nation of Islam adherents are allowed to have a religious mat or rug— but Ifa followers are not. (*Id.*) And Native Americans are permitted to have sage and other herbs—but not Ifa practitioners are not. (*Id.*) So, the MDOC policy explicitly permits many of the items Byrd has requested for other religions, and Defendants Leach and McKee both indicated they were aware of this but could not explain why Ifa should be treated differently. (Response to Motion for Summary Judgment Ex. Q, RE 87-18, PageID# 2204-10; Response to Motion for Summary Judgment Ex. J,

RE 87-11, PageID# 1996-2005.) In other words, like the plaintiff in *Koger*, if Byrd sought these items as an adherent of a different faith—the policy would permit them. This is exactly the kind of distinction that this Court in *Koger* found "facially discriminatory" such that "invidious purpose may be inferred." 964 F.3d at 1086.

Even though *Koger* straightforwardly applies here, the district court declined to follow it, explaining that "[u]nlike the claims in *Koger*, Byrd did not allege any discriminatory MDOC policy, he merely alleged discriminatory enforcement of a facially neutral policy." (Order, RE 109, Page ID #3064-65.) That misunderstands *Koger* and Byrd's claim. *Koger* rests on the plaintiff's claim that the prison imposed a "facially discriminatory *distinction*," not a facially discriminatory policy. 964 F.3d at 544. In other words, in *Koger* the policy as applied was discriminatory on its face because Muslims were allowed to fast but Rastafarians were not. The exact same circumstances are true here: other religious groups are permitted the *exact same* type of items that Byrd has been denied as an Ifa practitioner. The district court erred when it declined to apply *Koger* because Byrd has raised a genuine fact dispute as to whether the "facially discriminatory distinction" under the MDOC policy violates his rights under the Equal Protection Clause.

## B.    Defendants are not entitled to qualified immunity.

For the reasons discussed above, Byrd's rights to equal treatment as an Ifa practitioner were clearly established. As a result, Byrd's claim for monetary

damages against Defendants Haas, Leach, and McKee should also proceed. Any reasonable official in Defendants position should have known that denying Byrd items that are permitted to practitioners of other faiths violated Byrd's rights under the Equal Protection Clause. *See Cruz*, 405 U.S. at 323 (denying a prisoner "reasonable opportunity of pursuing his faith comparable to the opportunity afforded fellow prisoners" would amount to "palpable discrimination"); *see also Al Humrani v. Kleeman*, No. 2:05-cv-203, 2006 WL 2528461, at *6 (W.D. Mich. Aug. 31, 2006) ("Though it is not the realm of federal courts to enforce or interpret prison directives, these directives serve to clearly establish, in the minds of prison staff and officials, the constitutionally protected rights of prisoners.").

## V.    Byrd's Fourteenth Amendment Procedural Due Process claims against Defendant Haas should proceed.

The district court erred by disposing of Byrd's Fourteenth Amendment Due Process claims against Defendant Haas on summary judgment. The district court had initially denied summary disposition to Haas before erroneously reversing course on a motion for reconsideration and dismissing that claim on mootness grounds.[23] (Order, RE 109; Order, RE 114.) The district court's first determination was the right one, and this Court should permit that claim to proceed. There is at least a fact dispute as to whether Defendant Haas imposed an "atypical and significant

---

[23] *See supra* Part I.

hardship" on Byrd's right to practice his religion. *See Sandin v. Conner*, 515 U.S. 472, 486-87 (1995). Finally, Byrd's due process rights here are clearly established, so Byrd's individual-capacity claim for monetary damages should also proceed.

## A. Defendant Haas denied Byrd Fourteenth Amendment Due Process.

There are two steps to a procedural due process claim. The first step asks whether "there exists a liberty or property interest that has been interfered with by the States." *Ky. Dep't of Corr. v. Thompson*, 490 U.S. 454, 460 (1989). The second step "examines whether the procedures attendant upon that deprivation were constitutionally sufficient." *Id.* "[I]t is by now well established that incarceration in a penal institution does not extinguish the protections on the free exercise of religion afforded by the First Amendment." *Bakr v. Johnson*, 121 F.3d 707, at *1 (Table) (6th Cir. 1997) (citations omitted). Accordingly, a regulation that completely extinguishes an individual's right to practice his religion imposes an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *See Sandin v. Conner*, 515 U.S. 472, 486-87 (1995). After all, the ordinary incidents of prison life deliberately *include* opportunities for religious worship and practice, and a complete denial of such opportunities necessarily is outside the bounds of the "ordinary incidents of prison life." *Id.*

Defendant Haas's denial of Byrd's request created a "atypical and significant hardship" for Byrd because he could no longer practice his religion, a deprivation

which has gone on since 2015. The MDOC policy imposed a mandatory duty on Defendant Haas to forward Byrd's request through the appropriate chain of command—and there is no dispute that Haas never forwarded any of the requests that Byrd has submitted in the past five years. *See Thompson*, 490 U.S. at 463 (holding that to create a protected liberty interest a regulation must "contain explicitly mandatory language, *i.e.*, specific directives to the decisionmaker that if the regulation's substantive predicates are present, a particular outcome must follow[.]").

In short, the district court's initial decision to deny Defendant Haas summary judgment on this claim was the right one. As the Magistrate properly observed, imposing a restriction on Byrd's ability to practice his religion without a security or custody justification establishes a significant hardship. (Report & Recommendation, RE 98, PageID# 2609; *see also* RE 109.) In effect, through his de facto denials based on arbitrary unwritten requirements, Defendant Haas served as an irrational and immovable roadblock preventing Byrd from otherwise advancing his religious requests and receiving consideration. Defendant Haas's deliberate inaction deprived Byrd of his due process rights. Since the only ground for the district court's dismissal of this claim—mootness—was in error, this Court should permit Byrd's due process claim against Defendant Haas to proceed on the merits.

## B.    Defendant Haas is not entitled to qualified immunity.

The district court erroneously granted Defendant Haas qualified immunity on Byrd's due process claim. The district court concluded that no case "outlines that a warden's ineffective processing of a prisoner's request for group religious services as an 'atypical and significant hardship.'" (Order, RE 109, PageID# 3067.) But the district court mischaracterizes the due process violation here. The "atypical and significant hardship" was created by Haas's utter refusal to consider Byrd's request, thereby wholly denying Byrd's right to practice Ifa. In other words, it's not Defendant Haas's "ineffective processing" of Byrd's request that grounds this due process violation, but Haas's stubborn refusal to give a constitutionally significant religious accommodation request *any consideration at all* in light of *a mandatory obligation* to do so.

And, as just discussed, it is well established that Byrd has a protected liberty right to practice Ifa, and that the MDOC policy puts a mandatory duty on Defendant Haas to forward Byrd's request. Any reasonable official in Haas's position, therefore, should have known that outright, years-long refusal to consider Byrd's request for religious accommodation pursuant to a mandatory MDOC policy would risk denying Byrd his First Amendment rights without the due process of law to which he is entitled. *Stoudemire*, 705 F.3d at 568. Byrd's due process claim for monetary damages against Defendant Haas, therefore, should proceed.

## CONCLUSION AND RELIEF REQUESTED

For all of these reasons, Plaintiff/Appellant Gerald Byrd respectfully requests that the Court reverse the judgment of the district court and remand this case for further proceedings.

Respectfully submitted,

MILLER, CANFIELD, PADDOCK AND STONE, PLC

By:   /s/Jeffrey A. Crapko
       Jeffrey A. Crapko (P78487)
       Amanda Rauh-Bieri (P83615)
       150 West Jefferson, Suite 2500
       Detroit, MI  48226
       (313) 963-6420
       crapko@millercanfield.com
       rauh-bieri@millercanfield.com
       *Pro Bono Counsel for Plaintiff-Appellant*

Dated: April 16, 2021

## CERTIFICATE OF COMPLIANCE

I hereby certify that this 12,796-word brief complies with the Court's type-volume limitations.

Respectfully submitted,

MILLER, CANFIELD, PADDOCK AND STONE, PLC

By:   /s/Jeffrey A. Crapko
        Jeffrey A. Crapko (P78487)
        150 West Jefferson, Suite 2500
        Detroit, Michigan 48226
        crapko@millercanfield.com
        *Pro Bono Counsel for Plaintiff-Appellant*

Dated: April 16, 2021

# CERTIFICATE OF SERVICE

I hereby certify that on April 16, 2021, I electronically filed the foregoing document with the Clerk of the Court using the ECF system which will send notification of such filing to all ECF filing participants.

Respectfully submitted,

MILLER, CANFIELD, PADDOCK AND STONE, PLC

By:   /s/Jeffrey A. Crapko
      Jeffrey A. Crapko (P78487)
      150 West Jefferson, Suite 2500
      Detroit, Michigan 48226
      crapko@millercanfield.com
      *Pro Bono Counsel for Plaintiff-Appellant*

Dated: April 16, 2021

# ADDENDUM

## Designation of Relevant District Court Documents

| Record Entry No. | Description of Entry | Page ID |
| --- | --- | --- |
| 24 | Amended Complaint | |
| 58 | Report and Recommendation, Dated 8/08/2018 | |
| 60 | Byrd's Objection to Report and Recommendation | |
| 63 | Omnibus Order, Dated 9/25/2018 | 620 |
| 66 | Order of Assignment of Counsel | |
| 80 | Defendants' Motion for Summary Judgment | 726, 728, 736-38 |
| 87 | Byrd's Response to Defendants' Motion for Summary Judgment | |
| 87-2 | Byrd's Response to Defendants' Motion for Summary Judgment | 1281 |
| 87-3 | Byrd's Response to Defendants' Motion for Summary Judgment | 1283-1327 |
| 87-4 | Byrd's Response to Defendants' Motion for Summary Judgment | 1344-57, 1370-79, 1382-83, 1388, 1396-98, 1403-04, 1407-28, 1431, 1438-39, 1459-60, 1464-66, 1471-73 |
| 87-5 | Byrd's Response to Defendants' Motion for Summary Judgment | 1478-79, 1481-82 |
| 87-6 | Byrd's Response to Defendants' Motion for Summary Judgment | 1577-78; 1594 1616-18, 1625-26, 1628-30, 1630-53 |
| 87-7 | Byrd's Response to Defendants' Motion for Summary Judgment | 1692 |
| 87-8 | Byrd's Response to Defendants' Motion for Summary Judgment | 1694-1704 |

| 87-9 | Byrd's Response to Defendants' Motion for Summary Judgment | 1757-59, 1761-62 |
|---|---|---|
| 87-10 | Byrd's Response to Defendants' Motion for Summary Judgment | 1870-71, 1880-81, 1884-87, 1913-16 |
| 87-11 | Byrd's Response to Defendants' Motion for Summary Judgment | 1982-83, 1996-2005, 2066-91 |
| 87-12 | Byrd's Response to Defendants' Motion for Summary Judgment | 2148-52 |
| 87-14 | Byrd's Response to Defendants' Motion for Summary Judgment | 2154, 2156-58 |
| 87-15 | Byrd's Response to Defendants' Motion for Summary Judgment | 2161-69 |
| 87-16 | Byrd's Response to Defendants' Motion for Summary Judgment | 2170-72 |
| 87-18 | Byrd's Response to Defendants' Motion for Summary Judgment | 2204-10, 2218-19 |
| 87-20 | Byrd's Response to Defendants' Motion for Summary Judgment | 2274-79 |
| 87-21 | Byrd's Response to Defendants' Motion for Summary Judgment | 2281-89 |
| 87-22 | Byrd's Response to Defendants' Motion for Summary Judgment | 2291-97 |
| 98 | Report and Recommendation, Dated 5/29/2020 | 2609 |
| 99 | Transcript of Hearing on Motions Held 5/28/2020 | 2630-31 |
| 101 | Defendants' Objections to Report and Recommendation | |
| 102 | Byrd's Objection to Report and Recommendation | |
| 103 | Defendants' Objections to Report and Recommendation | 2716 |
| 105 | Byrd's Response to Defendants' Objection to Report and Recommendation on Motion for Summary Judgment | |
| 106 | Byrd's Response To Defendants' Objection to Report and Recommendation on Plaintiff's Expert Witness | |

| 108 | Order Requiring Supplemental Briefing | |
| 109 | Omnibus Opinion and Order, Dated 10/19/2020 | 3061-62; 3064-65, 3067 |
| 111 | Defendants' Motion for Reconsideration re RE 109 Omnibus Opinion and Order | |
| 112 | Defendants' Supplemental Brief re RE 108 | |
| 113 | Byrd's Supplemental Brief re RE 108 | |
| 114 | Omnibus Opinion and Order, Dated 11/23/2020 | 3131 |
| 115 | Judgment, Dated 11/23/2020 | |
| 116 | Notice of Appeal | |